**JUDGE HELLERSTEIN**

**13 CIV 3840**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARCO MENEGHETTI, Individually and on )
Behalf of All Others Similarly Situated, )
                                             )
                   Plaintiff, )
                                             )
     vs. )
                                             )
UNI-PIXEL, INC., REED J. KILLION, )
JEFFREY W. TOMZ and BERNARD T. )
MARREN, )
                                             )
                   Defendants. )
                                             )
_____ )

Civil Action No.

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of the common stock

of Uni-Pixel, Inc. ("Uni-Pixel" or the "Company") between December 7, 2012 and May 31, 2013

(the "Class Period"), against Uni-Pixel and three of its top officers (collectively with Uni-Pixel,

"defendants"), for violations of the federal securities laws.

2.      Defendant Uni-Pixel manufactures fingerprint-resistant and hard coat protective cover

films for touch screen-enabled devices.  Its key product is UniBoss, a copper-mesh film that sits

under the glass in touch-sensitive devices, and that the Company claims is cheaper to manufacture

and more responsive than other competing technologies.

3.      The Class Period starts on December 7, 2012.  Before the opening of trading that day,

a Friday, Uni-Pixel issued a press release entitled "*UniPixel and Major PC Maker Enter Multi-*

*Million Dollar Preferred Price and Capacity License Agreement to Introduce Products With*

*UniBoss-Based Touch Screens*."  The December 7, 2012 press release stated, in pertinent part, that

Uni-Pixel had "*joined forces* with a manufacturer of personal computers to develop and introduce

products that feature next-generation touch screens based on UniPixel's UniBoss™ pro-cap, multi-

touch sensor film," that "UniPixel ha[d] granted the PC maker *a limited exclusive license* in the

notebook market segment for UniBoss Performance Engineered Film technology that provide[d] the

licensee priority development, dedicated production capacity *and preferred pricing*," and that "*[t]he*

*license [could] be extended to the PC maker's supply chain, including third-party manufacturing*

*partners, touch panel module manufactures, controller manufactures, LCD makers and original*

*design manufacturers*."  According to the December 7, 2012 press release, the specific "terms of the

agreement and name of the PC maker [would for then remain] confidential," but through its Chief

Executive Officer ("CEO") and President, Uni-Pixel affirmatively stated in the press release that the

"*'preferred price and capacity license agreement further[ed] UniPixel's stated go-to-market strategy.*'"

    4.      Though the Company withheld the name of the "Major PC Maker" – along with any real specifics of the purported new deal – on this limited news, the price of Uni-Pixel stock still increased more than 18% from its close of $8.26 per share on December 6, 2012 to close at $9.75 per share on December 7, 2012, on unusually high volume of more than 1.1 million shares traded on that first day alone.

    5.      Then, relying directly upon Uni-Pixel's bullish mantra in the December 7, 2012 press release, on Monday December 10, 2012, those in the financial media published further positive reports examining the impact this purported contract was then having on Uni-Pixel's business and finances, with *Seeking Alpha* in particular emphasizing that "[a]n industry shift [was] about to take place in touchscreen manufacturing and UniPixel [was] at the forefront of that shift." According to *Seeking Alpha* that day, "[w]hen this shift starts to unfold *it should launch UniPixel's stock price*," as "[t]he company stands to reap huge revenue and profits from UniBoss as it gets adopted for use in tablets, smartphones and other touchscreen applications." According to *Seeking Alpha's* analysis, which cited Uni-Pixel's CEO/President, "UniPixel already ha[d] four design wins with tablet manufacturers and is working with numerous OEM's and ODM's to integrate UniBoss into other products," and according to "UniPixel's 3rd Quarter conference call and . . . most recent presentation," the Company was then on track to achieve revenues of upwards of $299 million by 2015, assuming *only* a 1.3% market share, which the author characterized as overly conservative based on defendants' bullish mantra.

    6.      *Seeking Alpha's* December 10, 2012 report also emphasized that "[w]ith only 9.7 million shares of stock outstanding *the price appreciation should be nothing short of amazing*!" And nothing short of amazing it was. As the market assimilated defendants' December 7, 2012

- 2 -

press release and the further analysis provided by *Seeking Alpha* and others, the price of Uni-Pixel stock rose another $5+ per share on Monday, December 10, 2012, closing above $15 per share that day, again on extremely unusually high volume of more than 3.2 million shares traded.

7.      Defendants would again prime the pump on April 8, 2013, issuing another press release entitled "UniPixel Signs Multi-Million Dollar Preferred Price and Capacity License With *Major Ecosystem Partner* for Its UniBoss Touch Screen Technology." The Company's April 8th press release again emphasized that "UniPixel ha[d] granted the partner a preferred price and capacity license for its UniBoss touch sensor technology," this time stating that "[t]he license fees paid under the agreement [would] be used to build out an additional one million square feet per month of production capacity for UniBoss."

8.      And on April 16, 2013, before the opening of trading, the Company would issue a report entitled "Kodak to Manufacture and Supply UniBoss Touch Sensors for UniPixel," which emphasized that "Kodak technology [was] to enable UniPixel to scale production to meet accelerating demand" and that it "[p]osition[ed] both companies for faster growth in [the] dynamic $16 billion global touch sensor market." The price of Uni-Pixel stock again rose on this news, increasing from its close of $32 per share on April 15, 2013 to close at $37.27 per share on April 16, 2013, on unusually high volume of more than 2.3 million shares traded.

9.      Based on defendants' bullish statements concerning Uni-Pixel's purportedly strong ongoing business metrics, Uni-Pixel stock traded at inflated prices throughout the Class Period, trading above $41 per share on April 17, 2012. Uni-Pixel and several of its senior executives immediately cashed in, with Uni-Pixel selling approximately *$44 million* of its common stock in an underwritten public stock offering at $32 per share on April 23, 2013, and several of its senior officers and directors, including its CEO/President, its Chief Financial Officer ("CFO") and the

- 3 -

Chairman of its Board of Directors, collectively selling more than *$5 million* worth of their Company shares at inflated prices during a single, very short trading window:

| NAME | DATE | SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|---|
| **REED J. KILLION**<br>CEO/PRESIDENT/DIRECTOR | 3/1/13 | 50,000 | $22.32 | $1,116,000 |
| **JEFFREY W. TOMZ**<br>CFO/CORP. SECTY | 3/1/13 | 40,000 | $22.34 | $893,600 |
| **ROBERT J. PETCAVICH**<br>SR. VP AND GENERAL MNGR. | 3/1/13 | 50,000 | $22.33 | $1,116,500 |
| **DANIEL K. VAN OSTRAND**<br>SR. VP RESEARCH & DEVEL. | 3/1/13 | 40,000 | $22.35 | $894,000 |
| **SEONG SIK SHIN**<br>CHIEF OPERATING OFFICER | 3/1/13 | 25,000 | $22.33 | $558,250 |
| **BRUCE I. BERKOFF**<br>DIRECTOR AND CHAIRMAN OF THE<br>BOARD | 3/1/13 | 10,000 | $21.94 | $219,400 |
| **ROSS ADAM YOUNG**<br>DIRECTOR | 3/1/13<br>3/4/13 | 10,000<br>4,000 | $22.30<br>$23.69 | $223,000<br>$94,760 |

10.    Then, on Saturday May 11, 2013, *Barrons* published an investigative report about Uni-Pixel entitled "Out of Touch? Uni-Pixel shares have rallied sharply on the company's hopes for its touchscreen technology. But hefty competition, and a history of product disappointments, suggest investors should be wary." The *Barrons* article recounted that "[t]ouchscreen technology [was] one of the hottest areas in computing, and multiple companies [were] racing to make screens bigger, smarter, and more responsive," noting that "[l]ittle Uni-Pixel ha[d] made especially big waves in this arena lately, even though its products aren't yet commercial," noting that its stock, "which traded in the single digits for more than four years, suddenly took off in December and ha[d] rallied feverishly since, to a recent $34.48," with "[a]t least one brokerage firm [placing] a price target of $60, which implie[d] a market value of $720 million, up from $415 million last week." Referencing the December 2012 deal with the still undisclosed "Major PC Maker," the *Barrons* article cited Uni-Pixel's CEO as stating that "'[i]f you want to speculate [on the size of the deal], one million square feet costs us about $11 million,'" noted that Uni-Pixel had "recognized $5 million in revenue from the deal in the first quarter, which accounted for almost all its revenue," and cited the CEO as stating that the second April 2013 "licensing pact with an 'ecosystem partner' could bring in more cash."

The May 11, 2013 *Barrons* article also stated that "[s]ome analysts and investors ha[d] speculated that the laptop maker [was] Dell," stating "Uni-Pixel 'said it to people privately, but they won't say it publicly,'" citing "one analyst who requested to be quoted anonymously." However, the *Barrons* article also cited Uni-Pixel's critics as stating that it was "better at promoting products to investors than bringing them to market."

11.     As the market further investigated, analyzed and assimilated the concerns raised in the May 11, 2013 *Barrons* article and a May 20, 2013 disclosure by Uni-Pixel that the "Major PC Maker" had reported delays with associated operating system software that would delay the appearance of products utilizing UniBoss technology from the third quarter of 2013 into the fourth quarter of 2013, and the issuance of several more investigative reporting pieces, with one on May 19, 2013 specifically emphasizing that Kodak had deemed the purported agreement with Uni-Pixel to be so insignificant that it had not even bothered to file a Current Report on Form 8-K with the SEC announcing it (something companies are required to do where agreements are both material and create legally enforceable rights and/or duties), the price of Uni-Pixel stock began plummeting, falling to $19.78 per share by the close of trading on May 30, 2013, on usually high trading volume.

12.     Then, on May 31, 2013, the price of Uni-Pixel stock plunged almost *24%* on the issuance of a *Seeking Alpha* report raising significant quality issues with the touch mesh employed in the UniBoss, detailing several industry experts discussing patterns of lines in a sample unit of the product, lines the *Seeking Alpha* author and his industry sources asserted rendered the product unsatisfactory.   In response to this report, *Barrons* noted the price of Uni-Pixel stock fell precipitously from its May 30, 2013 closing price of $19.78 per share to close $15.21 per share on May 31, 2013, *a decline of $4.57 per share*, on extremely high volume of more than 9 million shares traded.

13.     The true facts, which were known or recklessly disregarded by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     the terms of the purported December 2012 licensing agreement with a "Major PC Maker" were either immaterial or legally unenforceable;

(b)     the terms of the purported April 2013 licensing agreement with a "Major Ecosystem Partner" were either immaterial or legally unenforceable;

(c)     the terms of the purported April 2013 manufacture and supply agreement with Kodak were either immaterial or legally unenforceable;

(d)     there were significant design defects in the UniBoss technology; and

(e)     as a result, defendants knew the Company's projected sales and earnings were unattainable.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

15.     Venue is proper here pursuant to §27 of the 1934 Act. Acts and conduct complained of herein occurred in substantial part in this District. The roadshow used to conduct the $44 million underwritten follow-on stock offering on April 23, 2013 was conducted in large part in this District.

## THE PARTIES

16.     Plaintiff Marco Meneghetti purchased Uni-Pixel common stock as set forth in the attached Certification, which is incorporated herein by reference, and was damaged thereby.

17.     Defendant Uni-Pixel is a Delaware corporation. Its common stock has been listed on the NASDAQ, an efficient market, under the ticker symbol "UNXL" since its December 10, 2010 initial public offering.

18.     Defendant Reed J. Killion ("Killion") is, and was during the Class Period, Uni-Pixel's CEO, President, Principal Executive Officer and one of its directors.

19.     Defendant Jeffrey W. Tomz ("Tomz") is, and was during the Class Period, Uni-Pixel's CFO and Secretary.

20.     Defendant Bernard T. Marren ("Marren") is, and was during the Class Period, Chairman of the Uni-Pixel Board and one of its directors.

21.     The defendants identified above in ¶¶18-20 are referred to herein as the "Individual Defendants." The Individual Defendants are liable for the false statements pleaded herein, as those statements are each "group-published" information for which they are responsible.

## BACKGROUND TO THE CLASS PERIOD

22.     On May 24, 2012, the Company, assisted by one of its underwriters, Craig-Hallum Capital Group LLC ("Craig-Hallum"), filed a shelf registration statement (File No. 333-181656) registering the issuance of shares of its common stock for resale with the SEC, which was subsequently amended and declared effective by the SEC on June 8, 2012. On August 9, 2012, the Company conducted the first of what would be two underwritten public follow-on stock offerings, selling 2,520,585 shares of the Company's common stock at $5.25 per share, with Uni-Pixel raising approximately *$16 million* in gross proceeds in the offering. The Sole Book-Running Manager of the August 2012 offering was Craig-Hallum. Craig-Hallum received more than $1.1 million in underwriting fees for conducting the August 2012 offering.

23.     During the Class Period, Craig-Hallum, along with New York City-based underwriter Cowen and Company, LLC ("Cowen"), would jointly serve as Joint Co-Book-Running Managers of the Company's *$44 million* underwritten follow-on public stock offering on April 23, 2013, sharing more than $2.6 million in underwriting fees, which would also be conducted in part based on that same shelf registration statement originally filed in May 2012. Though Craig-Hallum is technically

headquartered in Minneapolis, Minnesota, its investment banking operations in connection with the Uni-Pixel offerings would be conducted in large part in New York City. For instance, in connection with conducting the roadshow for these offerings, Craig-Hallam conducted its 3rd Annual Alpha Select Conference at the Sentry Centers in New York City on September 27, 2012, where Uni-Pixel presented. Uni-Pixel also presented at Craig-Hallum's Annual Alpha Select Conference on October 6, 2011 in New York City.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

24.      The Class Period starts on December 7, 2012. Before the opening of trading that day, a Friday, Uni-Pixel issued a press release entitled "*UniPixel and Major PC Maker Enter Multi-Million Dollar Preferred Price and Capacity License Agreement to Introduce Products With UniBoss-Based Touch Screens.*" The December 7, 2012 press release stated, in pertinent part, that Uni-Pixel had "*joined forces* with a manufacturer of personal computers to develop and introduce products that feature next-generation touch screens based on UniPixel's UniBoss™ pro-cap, multi-touch sensor film," that "UniPixel ha[d] granted the PC maker *a limited exclusive license* in the notebook market segment for UniBoss Performance Engineered Film technology that provide[d] the licensee priority development, dedicated production capacity *and preferred pricing*," and that "*[t]he license [could] be extended to the PC maker's supply chain, including third-party manufacturing partners, touch panel module manufactures, controller manufactures, LCD makers and original design manufacturers.*" According to the December 7, 2012 press release, the specific "terms of the agreement and name of the PC maker [would for then remain] confidential," but through its CEO/President, Uni-Pixel affirmatively stated in the press release that the "'*[t]he preferred price and capacity license agreement further[ed] UniPixel's stated go-to-market strategy.*'"

25.      The Company filed a Current Report on Form 8-K with the SEC that day attaching the press release the Company had issued, but failed to attach the purported "*Multi-Million Dollar*

*Preferred Price and Capacity License Agreement*." In 2004, the SEC expanded the Form 8-K periodic reporting duties of publicly traded companies to require the disclosure within four days of all "material definitive agreement[s]," defined as those agreements which confer "rights that are material to the company and enforceable by the company against one or more other parties to the agreement." *Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date, Release Nos. 33-8400, 34-49424, 2004 SEC LEXIS 639, at \*3, \*16-\*17 (Mar. 16, 2004).* The SEC's new rule also strongly encouraged reporting companies to immediately attach the actual agreements, whereas the old rules allowed reporting companies to delay filing them until their next quarterly report. *Id.*

26.     Though the Company withheld the name of the "Major PC Maker" – along with any real specifics of the purported new deal – on this limited news, the Company's stock price still increased more than 18% from its close of $8.26 per share on December 6, 2012 to close at $9.75 per share on December 7, 2012, on unusually high volume of more than 1.1 million shares traded in that first day alone.

27.     Then, relying directly upon Uni-Pixel's bullish mantra in the December 7, 2012 press release, on Monday December 10, 2012, those in the financial media published further positive stories examining the impact this purported contract was then having on Uni-Pixel's business and finances, with *Seeking Alpha* in particular emphasizing that "[a]n industry shift [was] about to take place in touchscreen manufacturing and UniPixel [was] at the forefront of that shift." According to *Seeking Alpha* that day, "[w]hen this shift starts to unfold *it should launch UniPixel's stock price*" as "[t]he company stands to reap huge revenue and profits from UniBoss as it gets adopted for use in tablets, smartphones and other touchscreen applications." According to *Seeking Alpha's* analysis, which cited Uni-Pixel's CEO/President, "UniPixel already ha[d] four design wins with tablet manufacturers and is working with numerous OEM's and ODM's to integrate UniBoss into other

products," and according to "UniPixel's 3rd Quarter conference call and ... most recent presentation," the Company was then on track to achieve revenues of upwards of $299 million by 2015, assuming *only* a 1.3% market share, which the author characterized as overly conservative based on defendants' bullish mantra. *Seeking Alpha's* December 10, 2012 report also emphasized that "[w]ith only 9.7 million shares of stock outstanding *the price appreciation should be nothing short of amazing*!" And nothing short of amazing it was. As the market assimilated defendants' December 7, 2012 press release and the further analysis provided by *Seeking Alpha* and others, the Company's stock price rose another $5+ per share on Monday, December 10, 2012, closing above $15 per share that day, again on extremely unusually high volume of more than 3.2 million shares traded.

28.     On February 26, 2013, Uni-Pixel issued a press release announcing the Company's fourth quarter and fiscal 2012 financial results for the interim quarter and fiscal year ended December 31, 2012. In addition to announcing revenues of $76,200 during fiscal 2012 and again reciting the Company's purported "Fourth Quarter 2012 Operational Highlights," including "*[e]nter[ing] a multi-million dollar preferred price and capacity license agreement with a major manufacturer of personal computers* to introduce products that feature next-generation touch screens based on UniPixel's UniBoss™ pro-cap, multi-touch sensor film," the February 26, 2013 press release provided the following glowing "Management Commentary" purporting to describe the Company's then-present business metrics:

> "In 2012, we established a solid foundation toward the commercialization of our two flagship products, UniBoss and Diamond Guard™," said Reed Killion, CEO of UniPixel. "After engaging with Texas Instruments, Carestream and N-trig, qualifying multiple touch controller manufacturers and building out our downstream supply chain, *our efforts culminated with the signing of a multi-million dollar preferred price and capacity license agreement with a major PC maker*. Together, we are working to introduce products that feature next-generation touch screens based on our UniBoss pro-cap, multi-touch sensor film.

"*With UniBoss, we offer the touch ecosystem the unique advantages of metal mesh touch sensors based on an additive, roll-to-roll, flexible electronics process*, as compared to the traditional subtractive ITO-based and subtractive ITO replacement based touch sensor solutions. *Our UniBoss manufacturing process continues to be the only additive process that reduces manufacturing costs and supply chain complexity of current ITO and other ITO replacement sensors by minimizing manufacturing steps from about 40 to less than 10. Other production advantages include lower material costs and a simplified supply chain, as well as extensibility to many sizes and form factors*.

"*A UniBoss touch-screen offers higher touch response and sensitivity, superior touch distinction, better durability, and lower power requirements. UniBoss is coming into a touch module market that Display Search estimates will grow from $13 billion to $32 billion by 2018*.

"We are addressing the large market opportunity of UniBoss by leveraging licensees and partner infrastructure in order to scale our manufacturing capacity quickly to meet anticipated demand while maintaining a very efficient organizational structure with UniPixel. . . .

"*Looking ahead in 2013, we plan to execute additional preferred price and capacity license agreements as well as consider potential joint ventures relationships. We will continue to focus on building out capacity and developing our supply chain as we work closely with our new PC partner to bring their new UniBoss-based products to market*. We recently placed purchase orders for two new printing and two plating machines, which we will modify with UniBoss technology and calibrate for the UniBoss process. Each printer will be capable of printing trace widths down to 5 microns and produce, in a roll-to-roll process, 1 million units or square feet per month.

"*Given our strong progress, we expect to recognize approximately $5 million in revenue in the current first quarter. We are planning to begin limited production in the second quarter and ramp up to volume production in the third. We are targeting 60,000 units or square feet per month by the end of April, 200,000 by the end of June, 700,000 by the end of September and then achieving 1.3 million units monthly by January of 2014*.

*             *             *

"*Through the process of UniBoss development, we have become experts at engineering micro and nano structures, and applying ultra-thin conductive elements on film surfaces. Since our proprietary and patented thin-film technologies can be applied to a wide variety of applications beyond touch screens, we are enjoying a very exciting outlook for UniPixel over the coming months and years*."

29.     Also on February 26, 2013, Uni-Pixel would conduct an investor conference

providing more positive statements about the Company's then-present business metrics and financial

prospects, including that products from the "Major PC Maker" incorporating UniBoss technology would be on store shelves by September 2013 (during Uni-Pixel's 2013 third quarter). Uni-Pixel also filed an annual financial report on Form 10-K with the SEC that day which once again did not include a copy of the purported "***Multi-Million Dollar Preferred Price and Capacity License Agreement***" signed in December 2012. The Form 10-K was signed by each of the Individual Defendants and was certified under the Sarbanes Oxley Act of 2002 by defendants Killion and Tomz.

30.     Based on defendants' bullish statements concerning the Company's purportedly strong ongoing business metrics, Uni-Pixel stock would trade as high as $25 per share in intraday trading on February 28, 2013. Several of the Company's senior executives immediately cashed in, selling ***more than $5 million*** worth of their Company shares at inflated prices during a single very short trading window as follows:

| NAME | DATE | SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|---|
| **REED J. KILLION**<br>CEO/PRESIDENT/DIRECTOR | 3/1/13 | 50,000 | $22.32 | $1,116,000 |
| **JEFFREY W. TOMZ**<br>CFO/CORP. SECTY | 3/1/13 | 40,000 | $22.34 | $893,600 |
| **ROBERT J. PETCAVICH**<br>SR. VP AND GENERAL MNGR. | 3/1/13 | 50,000 | $22.33 | $1,116,500 |
| **DANIEL K. VAN OSTRAND**<br>SR. VP RESEARCH & DEVEL. | 3/1/13 | 40,000 | $22.35 | $894,000 |
| **SEONG SIK SHIN**<br>CHIEF OPERATING OFFICER | 3/1/13 | 25,000 | $22.33 | $558,250 |
| **BRUCE I. BERKOFF**<br>DIRECTOR AND CHAIRMAN OF THE BOARD | 3/1/13 | 10,000 | $21.94 | $219,400 |
| **ROSS ADAM YOUNG**<br>DIRECTOR | 3/1/13<br>3/4/13 | 10,000<br>4,000 | $22.30<br>$23.69 | $223,000<br>$94,760 |

31.     In anticipation of conducting the ***$44 million*** registered follow-on offering, defendants would again prime the pump on April 8, 2013, issuing another press release entitled "UniPixel Signs Multi-Million Dollar Preferred Price and Capacity License With ***Major Ecosystem Partner*** for Its UniBoss Touch Screen Technology." The Company's April 8th press release again emphasized that "UniPixel ha[d] granted the partner a preferred price and capacity license for its

UniBoss touch sensor technology," this time stating that "[t]he license fees paid under the agreement [would] be used to build out an additional one million square feet per month of production capacity for UniBoss." Once again, the Company would also filed a Current Report on Form 8-K that day announcing that it had "granted [a "touchscreen ecosystem"] partner a preferred price and capacity license for its UniBoss touch sensor technology," that it had "received an initial $5 million of scheduled payments from [its] PC maker licensee," and that it would "recognize th[at] revenue in the first quarter of 2013," *without attaching a copy of the purported contract to the Form 8-K*.

32.     On April 16, 2013, before the opening of trading, the Company issued a report entitled "Kodak to Manufacture and Supply UniBoss Touch Sensors for UniPixel," which emphasized that "Kodak technology [was] to enable UniPixel to scale production to meet accelerating demand" and that it "[p]osition[ed] both companies for faster growth in dynamic $16 billion global touch sensor market." Once again, on April 16, 2013, the Company would file a Current Report on Form 8-K announcing the signing of the Kodak "manufacturing and supply agreement" *without attaching a copy of the purported contract*. Nonetheless, the Company's stock price again rose on this news, increasing from its close of $32 per share on April 15, 2013 to close at $37.27 per share on April 16, 2013, on unusually high trading volume of more than 2.3 million shares traded.

33.     On April 18, 2013, Uni-Pixel announced that it had entered into an underwriting agreement with Cowen and Craig-Hallum relating to the underwritten registered offering 1,195,000 shares of the Company's common stock at an offering price to the public of $32.00 per share, and that under the terms of the underwriting agreement the Company had also granted the underwriters a 30-day option to purchase up to an additional 179,250 shares to cover over-allotments at the offering price. Defendants stated the offering would be completed by April 23, 2013.

34.    On April 18, 2013, Uni-Pixel and its underwriters also filed an additional registration statement registering additional shares of common stock for the April 2013 offering with the SEC (File No. 333-187975) pursuant to Rule 462(b) under the Securities Act of 1933, as amended (collectively, with the earlier shelf registration statement filed in 2012, the documents incorporated therein, and the prospectuses which formed part of those registration statements, the "Registration Statement"). The Registration Statement was signed by each of the Individual Defendants.

35.    The Registration Statement used to conduct the **$44 million** underwritten public follow-on stock offering on April 23, 2013 was false and misleading in that it failed to disclose that: (a) the terms of the purported December 2012 licensing agreement with a "Major PC Maker" were either immaterial or legally unenforceable; (b) the terms of the purported April 2013 agreement with a "Major Ecosystem Partner" were either immaterial or legally unenforceable; (c) the terms of the April 2013 purported manufacture and supply agreement with Kodak were either immaterial or legally unenforceable; (d) there were significant design defects in the UniBoss technology; and (e) as a result, defendants knew the Company's projected sales and earnings were unattainable.

36.    On April 30, 2013, after the close of trading, Uni-Pixel issued a press release announcing its first quarter 2013 financial results for the interim quarter ended March 31, 2013. In addition to announcing that "[r]evenue totaled a record $5.1 million in the first quarter of 2013, as compared to marginal revenues in the same year-ago quarter," with that "increase . . . primarily due to a $5.0 million payment under a new preferred price and capacity license agreement for UniBoss," and that Uni-Pixel had achieved a "record net income of $0.9 million or $0.07 per diluted share" in the first quarter of 2013, "as compared to a net loss of $2.0 million or $(0.29) per basic and diluted share in the same year-ago quarter," the April 30, 2013 press release also provided the following glowing "Management Commentary":

> "*Our record quarter was the result of the successful execution of our preferred price and capacity model for UniBoss,*" said Reed Killion, president and

CEO of UniPixel. "This included $5.0 million in a non-recurring engineering milestone payment from our major PC manufacturer licensee, *marking strong progress towards worldwide commercialization of our UniBoss touch screen technology*. The payment is helping to finance the ramp-up in our manufacturing capacity to meet anticipated customer demand, *as we address a touch module market that Display Search expects to grow from $13 billion to $32 billion by 2018*.

"*In the current quarter, we've begun shipping initial batches of sensors to our PC maker licensee*. The initial shipment quantities on the production line started at fifty moving to hundreds and then thousands over the next several months. *We also recently announced the engagement of a major ecosystem partner as another preferred price and capacity licensee to facilitate and finance the development, introduction and production of products that feature next-generation touch screens based on UniBoss. The license fees paid under this agreement will be used to build out an additional one million square feet per month of production capacity for UniBoss*.

"*Just a couple weeks ago, we entered into a manufacturing and supply agreement with Eastman Kodak to help build out this production capacity as well as future capacity growth*. Together with Kodak, we have begun construction on a state-of-the-art manufacturing and testing facility at the Eastman Business Park in Rochester, which has over 100,000 square feet of manufacturing space for our UniBoss roll-to-roll printing and plating lines. The site can easily be expanded to meet future capacity growth demands. Kodak's infrastructure allows us to be completely vertically integrated with chemistry groups, PET films, ink formations, plating and mastering all in-house for the manufacturing process.

"We recently reached our target production equipment capacity of 60,000 square feet per month. *We are now on track to ramp up capacity to 200,000 square feet per month by the end of June, 700,000 by the end of September, 1.3 million by January of 2014*. We plan to build out the equipment capacity of 10 million units a month by end of 2014. The increased capacity can be accomplished by expanding the Rochester site and adding additional printing and plating lines while increasing the throughput of printing and plating lines with continuous process improvement implementations.

"*In all, over the course of the last several months we have met our milestone deliverables, and have set the company on a solid course for growth and profitability in 2013*. Our focus for the remainder of the year will be on building out equipment capacity and ramping UniBoss production, while *working closely with our global licensees and manufacturing partners* on new designs and production opportunities. We will also pursue additional preferred price and capacity licensees and expand our downstream relationships with LCD panel manufactures, touch panel module manufactures and ODMs."

37.     Also on April 30, 2013, Uni-Pixel conducted an investor conference providing more

positive statements about the Company's then-present business metrics and financial prospects,

including that products from the "Major PC Maker" incorporating UniBoss technology would be on store shelves by September 2013 (during Uni-Pixel's 2013 third quarter). Uni-Pixel also filed a quarterly financial report on Form 10-Q with the SEC that day which once again did not include a copy of the purported "*Multi-Million Dollar Preferred Price and Capacity License Agreement*" signed in December 2012 or the license agreement and manufacturing and supply agreements purportedly entered into in April 2013. The Form 10-Q was signed and certified under the Sarbanes Oxley Act of 2002 by defendants Killion and Tomz.

38.     On May 20, 2013, the Company filed a Current Report on Form 8-K announcing that it had issued a press release disclosing that it had received a $5 million payment according to its recently announced second preferred price and capacity license "with a major touch-screen ecosystem partner," explaining that it would "recognize the $5 million as deferred revenue in the second quarter of 2013 and apply the funds toward building out an additional one million square feet per month of UniBoss production capacity." The press release was attached to the Form 8-K, but once again, none of the license or manufacturing and supply agreements purportedly entered into in in December 2012 and April 2013 were attached.

39.     On Saturday May 11, 2013, *Barrons* published an investigative report about Uni-Pixel entitled "Out of Touch? Uni-Pixel shares have rallied sharply on the company's hopes for its touchscreen technology. But hefty competition, and a history of product disappointments, suggest investors should be wary." The *Barrons* article recounted that "[t]ouchscreen technology [was] one of the hottest areas in computing, and multiple companies [were] racing to make screens bigger, smarter, and more responsive," noting that "[l]ittle Uni-Pixel ha[d] made especially big waves in this arena lately, even though its products aren't yet commercial," noting that its stock, "which traded in the single digits for more than four years, suddenly took off in December and ha[d] rallied feverishly since, to a recent $34.48," with "[a]t least one brokerage firm [placing] a price target of $60, which

implie[d] a market value of $720 million, up from $415 million last week." Referencing the December 2012 licensing deal with the still undisclosed "Major PC-Maker" partner, the *Barrons* article cited Uni-Pixel's CEO as stating that "'[i]f you want to speculate [on the size of the deal], one million square feet costs us about $11 million,'" noted that Uni-Pixel had "recognized $5 million in revenue from the deal in the first quarter, which accounted for almost all its revenue," and cited the CEO as stating that the second April 2013 "licensing pact with an 'ecosystem partner' could bring in more cash." The May 11, 2013 *Barrons* article also stated that "[s]ome analysts and investors ha[d] speculated that the laptop maker [was] Dell," stating "Uni-Pixel 'said it to people privately, but they won't say it publicly,'" citing "one analyst who requested to be quoted anonymously." However, the *Barrons* article also cited Uni-Pixel's critics as stating it was "better at promoting products to investors than bringing them to market."

40.    As the market further investigated, analyzed and assimilated the concerns raised in the *Barrons* article and a May 20, 2013 disclosure by Uni-Pixel that the "Major PC Maker" had reported delays with associated operating system software that would delay the appearance of products utilizing UniBoss technology from the third quarter of 2013 into the fourth quarter of 2013, and the issuance of several more investigative reporting pieces, with one on May 19, 2013 specifically emphasizing that Kodak had deemed the purported agreement with Uni-Pixel to be so insignificant that it had not even bothered to file a Current Report on Form 8-K with the SEC announcing it (something companies are required to do where agreements are both material and create legally enforceable rights and/or duties), the Company's stock price began plummeting, falling to $19.78 per share by May 30, 2013, on usually high trading volume.

41.    Then, on May 31, 2013, Uni-Pixel's stock plunged almost 24% on the issuance of a *Seeking Alpha* report raising significant quality issues with the touch mesh employed in the UniBoss, detailing several industry experts discussing patterns of lines in a sample unit of the product, lines

the *Seeking Alpha* author and his industry sources asserted rendered the product unsatisfactory. In response to this report, *Barrons* noted the price of Uni-Pixel stock fell precipitously from its May 30, 2013 closing price of $19.78 per share to close $15.21 per share on May 31, 2013, *a decline of $4.57 per share,* on extremely high volume of more than 9 million shares traded.

42.     The true facts, which were known or recklessly disregarded by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     the terms of the purported December 2012 licensing agreement with a "Major PC Maker" were either immaterial or legally unenforceable;

(b)     the terms of the purported April 2013 licensing agreement with a "Major Ecosystem Partner" were either immaterial or legally unenforceable;

(c)     the terms of the purported April 2013 manufacture and supply agreement with Kodak were either immaterial or legally unenforceable;

(d)     there were significant design defects in the UniBoss technology; and

(e)     as a result, defendants knew the Company's projected sales and earnings were unattainable.

## DEFENDANTS' SCIENTER

43.     Defendants are Uni-Pixel and its top officers and directors. Each of the Individual Defendants ran Uni-Pixel as a manager, dealing with important issues facing Uni-Pixel's business, and controlled the grossly inflated statements concerning Uni-Pixel's Class Period operational status, and Uni-Pixel's ability to achieve its target revenues and earnings.

44.     Each of the Individual Defendants, by virtue of their high-level positions with Uni-Pixel, directly participated in the management of Uni-Pixel, was directly involved in the day-to-day operations of Uni-Pixel at the highest levels and was privy to confidential proprietary information concerning Uni-Pixel and its business, operations, products, growth, financial statements and

financial condition and was aware of or deliberately disregarded that false and misleading statements were being made by and regarding the Company. Because of their managerial positions with Uni-Pixel, each of the Individual Defendants had access to the adverse undisclosed information about Uni-Pixel's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

45.     Each Individual Defendant was personally familiar with the terms (or lack thereof) of the purported agreements announced in December 2012 and April 2013 because they were involved in negotiating those deals and with determining whether and what to disclose about them. Each also monitored product defect issues related to Uni-Pixel's UniBoss technology, closely monitoring the performance of Uni-Pixel's operations via reports from Uni-Pixel's Finance Department, which were generated and provided to the Individual Defendants on a regular basis. As a result of their monitoring, each Individual Defendant was aware that Uni-Pixel was not on track to meet its sales and earnings projections.

46.     Each of the Individual Defendants participated in or failed to prevent the false reports regarding Uni-Pixel's operational and financial condition during the Class Period to maintain the Company's high stock price to facilitate the sale of tens of millions of dollars of Uni-Pixel stock by Uni-Pixel and certain of its senior executives at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

47.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Uni-Pixel's stock price and operated as a fraud or deceit on Class Period purchasers of Uni-Pixel stock by misrepresenting the Company's business success and future business prospects. Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting the Company's

business prospects. Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Uni-Pixel stock fell precipitously as the prior artificial inflation came out of the price of Uni-Pixel stock. As a result of their purchases of Uni-Pixel stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

48.     During the Class Period, defendants presented a misleading picture of Uni-Pixel's business and prospects instead of truthfully disclosing during the Class Period that Uni-Pixel's business was not as healthy as represented.

49.     These false claims of strong future results, among other statements detailed herein, caused and maintained the artificial inflation in the price of Uni-Pixel stock throughout the Class Period and until the truth was revealed to the market.

50.     Defendants' materially false and misleading statements had the intended effect and caused Uni-Pixel stock to trade at artificially inflated levels throughout the Class Period.

51.     As investors and the market became aware during May 2013 that Uni-Pixel's actual business prospects were poorer than represented, which had been obfuscated by defendants, the prior artificial inflation came out of the price of Uni-Pixel stock, damaging investors.

52.     As a direct result of defendants' admissions and the public revelations regarding the truth about Uni-Pixel's previous representations and its actual business prospects going forward, the price of Uni-Pixel stock declined precipitously during May 2013. This drop removed the inflation from the price of Uni-Pixel stock, causing real economic loss to investors who had purchased the stock during the Class Period. In sum, as the truth about defendants' fraud and Uni-Pixel's business performance was revealed, the price of Uni-Pixel stock plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged.

53.     The significant decline in the price of Uni-Pixel stock at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the price of Uni-Pixel stock negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

54.     This is a class action on behalf of purchasers of Uni-Pixel common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families and the officers and directors of the Company, as well as their families.  Class members are so numerous that joinder of them is impracticable.

55.     Common questions of law and fact predominate and include: (i) whether defendants violated the 1934 Act; (ii) whether defendants omitted and/or misrepresented material facts; (iii) whether defendants knew or recklessly disregarded that their statements were false; and (iv) whether the price of Uni-Pixel common stock was inflated during the Class Period and the extent of and appropriate measure of damages.

56.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violations of §10(b) of the 1934 Act and
### Rule 10b-5 Against All Defendants

57.     Plaintiff incorporates by reference ¶¶1-56.

58.     Defendants violated §10(b) and Rule 10b-5 by:

- 21 -

(a)     Employing devices, schemes and artifices to defraud;

(b)     Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of Uni-Pixel common stock.

59.     Class members were damaged as they paid artificially inflated prices for Uni-Pixel common stock in reliance on the integrity of the market.

## COUNT II

### For Violations of §20(a) of the 1934 Act
### Against All Defendants

60.     Plaintiff incorporates by reference ¶¶1-59.

61.     The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the 1934 Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their stock ownership, high-level positions, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.  Uni-Pixel controlled the Individual Defendants and all of its employees.

62.     By reason of such wrongful conduct, the defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, individually and on behalf of the Class, prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel.

B.      Awarding plaintiff and other members of the Class damages together with interest thereon;

C.      Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.      Awarding plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 5, 2013                    ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       DAVID ROSENFELD


                                       SAMUEL H. RUDMAN

                                       58 South Service Road, Suite 200
                                       Melville, NY 11747
                                       Telephone: 631/367-7100
                                       631/367-1173 (fax)
                                       srudman@rgrdlaw.com
                                       drosenfeld@rgrdlaw.com

ADEMI & O'REILLY, LLP
GURI ADEMI
3620 East Layton Avenue
Cudahy, WI 53110
Telephone:  414/482-8000
414/482-8001 (fax)

Attorneys for Plaintiff

## PLAINTIFF'S CERTIFICATE

I, Marco Meneghetti ("Plaintiff"), declare, as to the claims asserted under the Federal Securities laws, that:

1.      Plaintiff has reviewed the complaint against UniPixel, Inc., and certain other defendants, and authorizes its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including acting as a Lead Plaintiff and providing testimony at deposition and trial, if necessary.

4.      Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

5.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6.      In addition, Plaintiff has made no transaction(s) during the Class Period in the securities of UniPixel, Inc. (attach additional page(s), if necessary).

| **Purchases** | | | **Sales** | | |
| --- | --- | --- | --- | --- | --- |
| Date(s) | Number Of Shares | Price($) | Date(s) | Number of Shares | Price ($) |
| 5/17/13 | 200 | 29.13 | 5/31/13 | 700 | 17.76 |
| 5/17/13 | 200 | 32.14 | | | |
| 5/20/13 | 100 | 28.50 | | | |
| 5/20/13 | 200 | 29.88 | | | |
| | | | | | |
| | | | | | |

7.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except if detailed as follows: _____

I declare under penalty of perjury, under the laws of the United States, this _3_ day of June, 2013 that the information above is accurate.

_____
Marco Meneghetti